**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| **United States of America** | ) | |
| | ) | **No. 14 CR 390-2** |
| **v.** | ) | |
| | ) | **Judge Amy J. St. Eve** |
| **Tyler Lang** | ) | |
| | ) | |

DEFENDANT TYLER LANG'S SENTENCING MEMORANDUM

The defendant, **Tyler Lang**, by the Federal Defender Program and its attorney **Geoffrey M. Meyer**, now submits his memorandum on sentencing. Mr. Lang stands before this Court after pleading guilty to one count of conspiring to travel in interstate commerce with the purpose of damaging an animal enterprise, 18 U.S.C. § 43(a)(2)(C). He accepts responsibility for his actions and is prepared to serve a just sentence. Mr. Lang requests that the Court impose the following sentence: **three years of probation**. Such a sentence is sufficient, but not greater than necessary to fulfill the statutory sentencing objectives.

BACKGROUND

On August 15, 2013, police in Woodford County, Illinois, stopped the vehicle in which Tyler Lang and Kevin Johnson were driving. During the stop, officers discovered items that tied Mr. Lang and Mr. Johnson to vandalism that occurred two days earlier at a nearby mink ranch in Morris, Illinois. Both Mr. Lang and Mr. Johnson were arrested and charged with various state crimes. They were both detained beginning the day of their arrest.

On November 6, 2013, a Woodford County judge held a change of plea hearing for Mr. Lang. After initially rejecting a proposed plea agreement as too lenient, the judge ultimately accepted a revised plea agreement with harsher penalties. Pursuant to the agreement, Mr. Lang pleaded

guilty to possessing burglary tools (a class 4 felony). The judge sentenced Mr. Lang to 30 months' non-reporting probation and included as conditions of probation imprisonment for 170 days, 50 hours of public service, and $1,549.50 in fines and court costs. After accounting for time served and good time credit, Mr. Lang was released on November 8, 2013.[1]

On July 8, 2014, both Mr. Lang and Mr. Johnson (who was still in IDOC) were charged with one count of conspiring with each other to violate the Animal Enterprise Terrorism Act, 18 U.S.C. § 43, and one count of substantively violating the Act. By this time, Mr. Lang had returned to his home state of California and was serving his Illinois probation in that state. He returned to Illinois for an arraignment before Judge Shadur on July 29, 2014, at which time Judge Shadur allowed him to remain on a personal recognizance bond while his case progressed. On July 22, 2015, Mr. Lang changed his plea on the conspiracy count to guilty pursuant to a written plea agreement with the government. The matter is now before the Court for sentencing.

DISCUSSION

As this court is well aware, after *Booker*, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) when imposing sentence. *United States v. Booker*, 543 U.S. 220, 245 (2005). After considering the factors, the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. 18 U.S.C. § 3553(a) (emphasis added). This parsimony provision serves as the "overarching" command of the statute. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

---

[1] Mr. Johnson later pleaded guilty to the same charge and was sentenced to 30 months' imprisonment in the Illinois Department of Corrections.

## I.   The Advisory Guidelines Calculation – 18 U.S.C. § 3553(a)(4)

The Supreme Court has instructed sentencing courts to begin by properly calculating the advisory guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4). Sentencing courts may not, however, presume that a guideline sentence is the correct one, *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Rita v. United States*, 551 U.S. 338, 351 (2007), or even place "a thumb on the scale favoring a guideline sentence," *United States v. Pennington*, 667 F.3d 953, 958 (7th Cir. 2012) (internal quotations omitted).

The Probation Office conducted a Presentence Investigation and prepared a Presentence Report using the November 2014 Guidelines. The PSR calculated an adjusted offense level of 16 before applying a three-level reduction for acceptance of responsibility. This yielded a total offense level of 13. The Probation Office assessed Mr. Lang as a criminal history category II. The resulting advisory guidelines range of imprisonment proposed in the PSR was 15 to 21 months.

Mr. Lang acknowledges that a mechanical application of the guidelines results in the advisory range contained in the PSR, however he objects to two aspects of the calculation: 1) the criminal history category contained in the PSR overstates the seriousness of his criminal history, and 2) although the PSR acknowledges that Mr. Lang's Illinois conviction for possession of burglary tools is relevant conduct, it fails to account for the sentence of imprisonment he received in that case.

The PSR assigns Mr. Lang three criminal history points based entirely on a single misdemeanor conviction for petty theft in California in 2011. For the offense—stealing $13.49 worth of produce from a Ralph's grocery store—the California court sentenced Mr. Lang to three days' jail and three years' probation. The PSR accordingly assessed Mr. Lang one point because

the conviction was punished by a sentence of less than 60 days' imprisonment, *see* §4A1.1(c), and two additional points because Mr. Lang was on probation for that sentence when he committed the instant offense, *see* §4A1.1(d). The end result is that Mr. Lang, by virtue of a theft worth less than $15, is classified as criminal history category II.

Fortunately, this Court is not required to mechanically apply the criminal history category rules found in Chapter Four of the guidelines. To the contrary, §4A1.3(b)(1) directs the Court to consider whether there is information available to indicate that a defendant's criminal history category "substantially over-represents the seriousness of the defendant's criminal history," and in those cases, to depart downward from the recommended guideline range.[2] Thus, under §4A1.3, the Court is able to consider the nature of the prior offenses and the circumstances under which they were committed, to, in effect, put the defendant's record in the context of his life and background. Because the Sentencing Commission has recognized the inherent limitations in the mathematical approach to criminal history, a departure under §4A1.3 does not require unusual or extraordinary factors. *See* U.S.S.G. §4A1.3 (background commentary) ("[T]he criminal history score is *unlikely* to take into account all the variations in the seriousness of criminal history that may occur.") (emphasis added). Instead, the Commission has instructed courts to place the defendant in the criminal history category that most accurately reflects the seriousness of his prior record.

For example, the Court should consider whether the inclusion of minor, non-violent offenses results in a distortion of the defendant's criminal history category. The Guidelines focus on the length and timing of the prior sentence, but analysis of the *nature* of the offense better reflects the seriousness of the record and likelihood of recidivism. The law of this circuit also recognizes

---

[2] Although the concept of departures has been rendered obsolete after *United States v. Booker*, 543 U.S. 220 (2005), the district court may apply the departure guidelines by way of analogy in analyzing the section 3553(a) factors. *United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005).

4

the district court's authority to depart downward from an over-stated criminal history. *United States v. Abbot*, 30 F.3d 71, 72-73 (7th Cir. 1995). Further, in *United States v. Newman*, 965 F.2d 206 (7th Cir. 1992), the Seventh Circuit, noted the types of prior sentences offenders had typically received in determining their criminal history categories. The court found offenders with a Category I criminal history had essentially a record of no significance, like Mr. Lang. Offenders who qualified for a Category II had records involving at least a 60-day prison sentence, while placement in Category III required two separate prison sentences each of over a year. *Newman*, 965 F.2d 211.

Mr. Lang's single misdemeanor conviction does not accurately reflect a typical offender with a Category II criminal history. While Mr. Lang's record is not completely spotless, the only spot prior to this offense does not reflect the type of criminal record anticipated by the Seventh Circuit for a Category II offender. His placement in Category II overstates the seriousness of his prior conduct, and placement in Category I more accurately represents the seriousness of his prior offense conduct.

Mr. Lang also objects because the PSR fails to account for the term of imprisonment imposed in state court for his conviction for possessing burglary tools. Section 5G1.3(b) of the sentencing guidelines provides that a sentence "shall be adjusted" to account for the completed portion of an undischarged prison term if the undischarged sentence was imposed for "another offense that is relevant conduct to the instant offense of conviction."[3] Here, the PSR recognizes Mr. Lang's conviction for possession of burglary tools is part of the instant offense. (PSR ¶35) However, Mr. Lang's prior sentence is no longer "undischarged." The custodial portion of his sentence was

---

[3] On November 1, 2014, §5G1.3(b) was amended to remove a second requirement that the prior offense conduct resulted in an increase in offense level for the instant offense. U.S.S.G. app. C amend. 787 (Nov. 1, 2014).

fully discharged in November 2013. In cases such as Mr. Lang's, the commentary to guideline §5G1.3 directs the Court to guideline §5K2.23.[4]

Guideline §5K2.23 was adopted to specifically deal with situations like Mr. Lang's and specifically permit courts to downward depart for discharged terms of imprisonment where §5G1.3 would have permitted a downward departure had the term of imprisonment been undischarged. Section 5K2.23 explains that a reduction still "may be appropriate" as a matter of discretion if the other criteria of §5G1.3(b) are met for the discharged sentence. Thus, if Mr. Lang had just been sentenced to those 170 days in state custody today, §5G1.3 would mandate that the two sentences run concurrently. Because he finished serving that state sentence two years ago, that is no longer possible. Mr. Lang is asking that he not be required to serve time twice for the same offense.

## II. The remaining Section 3553(a) sentencing factors call for a sentence significantly less severe than the advisory guidelines range.

In *Gall v. United States*, 552 U.S. 38, 50 (2007), the Supreme Court stated that a district court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented." Furthermore, the Court rejected the idea that "extraordinary circumstances" are required to justify a sentence outside the Guidelines' advisory range. *Id.* at 47. Application of the § 3553(a) factors to this case leads to the conclusion that a sentence of probation is appropriate. Indeed, this case exemplifies why the Supreme Court rejected mandatory and mechanical application of the Sentencing Guidelines and restored district courts' discretion "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

---

[4] *See* U.S.S.G. §5G1.3 n.5 "In the case of a discharged term of imprisonment, a downward departure is not prohibited is the defendant (A) has completed serving a term of imprisonment; and (B) subsection (b) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense. *See* §5K2.23 (Discharged Terms of Imprisonment).

the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).

**A. While this offense is undoubtedly a serious one, 18 U.S.C. § 3553(a)(2)(A), Mr. Lang's history and characteristics, combined with his sincere remorse, counsel for a sentence without further incarceration, 18 U.S.C. § 3553(a)(1)**

In discussing this case, perhaps more than most, precision in the use of language is extremely important. For example, in the sentencing recommendation the Probation Office states that Mr. Lang has, "a brief history of involvement in incidents similar to the instant offense." This is simply not true. Mr. Lang has a lengthy history of engaging in lawful animal activism, and no history of engaging in any other activities that are comparable to the events of August 2013. This error is emblematic of how individuals often mistakenly impute the actions of extreme groups like the Animal Liberation Front into the term "animal activism." To be clear: Tyler Lang is not and never has been a member of the ALF or any similar groups. He is a dedicated and long-term defender of animal rights, who in August 2013 exercised extremely poor judgment in committing this crime. A mistake that he made for the first time at age 24, and that has not been repeated in the 28 months since he was released from the Woodford County Jail.

What Mr. Lang did was wrong. However misguided his actions in this case were, it is important for the Court to remember that his actions did not come from a place of malice. They are rooted in a deep love of animals, coupled with frustration at the slow pace of change. Mr. Lang has been advocating for animal rights since he was 14 years old. What began as simply passing out educational literature grew into lawful protest in an attempt to better educate the public and provide targeted pressure to end exploitive practices.

His dedication to the cause of animal rights is a remarkable constant in his young life. As the PSR recounts, the conditions of his childhood were not always stable. (PSR ¶¶45-48) In addition

to the conditions that existed within his family, school presented its own challenges. Narbonne High School, the last school in which Mr. Lang was enrolled, had a significant gang problem and police presence was common. Mr. Lang's response to the problem was not uncommon—he dropped out. But he did not wander aimlessly into adulthood. At age 18 he began working for his father's construction company. When that company closed in 2008, he continued to work in the construction business. Throughout it all he remained actively involved in the animal rights movement.

As the years dragged on, however, his activism appeared to have little effect. When Mr. Lang was in his early twenties—often a period of youthful impatience—he longed to see results. Instead he saw what he interpreted as an apathetic public. He viewed his own work as a failure because there was no visible change. That is when he made the decision to participate in more direct action and raid a fur farm.

As he explains in his letter to the Court,[5] he wishes that he could take that decision back. He understands that his actions have done more harm than good, and that he has set back the broader animal rights cause by acting outside the law. More concretely, he regrets that such a large number of mink died in the manner in which they did. He is aware that this offense is a serious one, and that, it has affected many people other than himself. He has let down his family—his father who needs his help running the construction business and his mother who needs his financial help to maintain her housing. And importantly, he expresses a deep regret about the emotional toll his actions have had on the Rodegheros.

The Supreme Court has explained that "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240. That admonition is particularly relevant in Mr.

---

[5] Mr. Lang's letter to the Court will be submitted directly to chambers.

8

Lang's case. What he did was wrong. He has admitted it, taken responsibility for it, and already served time in jail for it. But the root causes of Mr. Lang's actions were not hatred or malevolence. His actions came from a place of empathy, compassion, and loyalty. This is why it was so important to Mr. Lang that the phrase "liberation is love" was spray painted on the barn at the mink farm—so that his motivations would not be misinterpreted. The Court should consider this when imposing sentence.

**B. Mr. Lang is statutorily eligible for a sentence of probation for this offense, 18 U.S.C. § 3561(a), and such a sentence is serious enough punishment to fulfill the goals of the sentencing statute, 18 U.S.C. § 3553(a)(3).**

The Court must consider the many kinds of sentences available. 18 U.S.C. § 3553(a)(3). Congress, when determining the appropriate punishment for this type of offense, did not foreclose probation as a possible sentence, as it has for many other crimes. *See* 18 U.S.C. §§ 3561(a); 43(a)(2)(C). For many of the reasons discussed above, particularly Mr. Lang's lack of any significant criminal history and his positive performance on both Illinois state probation and federal pretrial release, he seems uniquely positioned to be supervised by the probation department.

Probationary sentences, while qualitatively less severe than equivalent terms of custodial sentences, are still significant punishment. The Supreme Court acknowledged this in *Gall v. United States*, explaining:

> Offenders on probation are…subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

552 U.S. 38, 48 (2007). Under the proposed sentence, Mr. Lang would be subject to many of these same conditions discussed in *Gall*. Any failure to comply with the conditions that this Court sets will result in a violation and the threat of prison; the repercussions will be swift and severe.

As such, the punitive purpose of sentencing can be achieved with a probationary sentence. That is because the punitive effect of any sentence is not viewed in a vacuum by simple, bland reference to an offense; rather, that effect is, and must be, measured against Mr. Lang and his individual case. The conditions of probation that this Court sets further intensify that punishment. To the extent that the Court feels any additional punishment is necessary, it can fashion a sentence of home detention and require community service hours in order to meet those incremental needs.

When determining the sentence, the Court should also consider whether less costly types of sentences than incarceration can fulfill the statutory sentencing objectives. The PSR indicates that the annual cost to incarcerate a person in federal custody is over $30,000. (PSR ¶82) By contrast, the annual cost of supervision by a probation officer is under $4,000. (*Id.*) Recently, Judge Posner has instructed district court judges to consider the costs of incarceration when selecting an appropriate sentence. *See United States v. Presley*, 790 F.3d 699, 702 (7th Cir. 2015); *United States v. Craig*, 703 F.3d 1001, 1003 (7th Cir. 2012) (concurring). In appropriate cases, such as cases where a person has already been incarcerated for a period of time, has performed well on pretrial release, and is gainfully employed, supervision by a probation officer drastically cuts the costs to society of additional incarceration, while also effectively accomplishing the sentencing goals.

In short, a probationary sentence, particularly one that includes home detention, is far from lenient. It provides significant punishment to reflect the seriousness of the offense, but also allows Mr. Lang to continue down the right path—the path that has recommitted to while on pretrial release. The factors articulated in § 3553(a) will be better served by supporting Mr. Lang in the changes he has made, rather than by separating him from his family and his employment.

**C.  A sentence of incarceration will inhibit Mr. Lang's ability to pay restitution to the Rodegheros. 18 U.S.C. § 3553(a)(7).**

In considering the type of sentence to impose, a sentencing court may consider how its sentence will affect the defendant's ability to make financial restitution. 18 U.S.C. § 3553(a)(7). The district court did precisely that in *United States v. Peterson*, 363 F. Supp. 2d 1060 (E.D. Wis. 2005), when it varied from the guideline range substantially to facilitate the defendant's payment of restitution. In explaining why he varied from a guideline range of 12 to 18 months' imprisonment to a sentence of one day in prison followed by community confinement, the district judge said:

> If I had sentenced defendant consistent with the guidelines, he would have lost his job. This would have impaired his ability to repay the money he stole. I do not suggest that a defendant should receive a break just because he owes restitution. But in the present case, where defendant had a reasonably well-paying job and the restitution amount was manageable, § 3553(a)(7) weighed in favor of a sentence that would allow him to remain in the community and working.
>
> *Id.* at 1062.

Mr. Lang is a smart, talented young man with extensive experience in the construction industry. Until a recent foot injury, he had stable work with his father in the construction company that they started together.[6] Once medically cleared to return to work, the financial information in the PSR indicates that Mr. Lang will be in a position to being paying restitution to

---

[6] Recently Mr. Lang fractured his foot in a racing accident. He is currently on crutches and for the next several weeks will be unable to work.

the Rodegheros and helping, at least on from a financial perspective, to make them whole. In fashioning an appropriate sentence, this Court should seek to maximize, rather than curtail, Mr. Lang's ability to make restitution.

### D. Mr. Lang presents a low risk of recidivism, 18 U.S.C. § 3553(a)(2)(C), and a sentence of *further* incarceration is not necessary to deter others from committing similar crimes, 18 U.S.C.§ 3553(a)(2)(B).

The goal of deterrence is two-fold: to deter the defendant from engaging in future criminal activity (specific deterrence) and to deter other people from committing crimes (general deterrence). When evaluating these goals in Mr. Lang's case, the Court must determine what punishment will be minimally sufficient to achieve each of them.

#### 1. Specific Deterrence

The risk of Mr. Lang recidivating is extremely low. He has no history of committing this type of crime previously. Perhaps more importantly, in the 28 months since his release from the Woodford County jail he has complied with all the terms of his probation and federal pretrial release. He has shown no signs of returning to the type of behavior that resulted in this case. Instead he has been working at his father's construction company and spending his free time racing fixed-gear bicycles. (PSR ¶49) He has once again become a productive member of society and is committed to remaining so.

He remains committed to the cause of animal rights, however his involvement has changed. Over the last two years Mr. Lang has taken part in protests. This is not a violation of his bond; Mr. Lang's right to lawfully protest was specifically preserved when Judge Shadur set the conditions of his release. However, over the last year, he has even curtailed these activities for fear they may be misinterpreted. Instead, Mr. Lang largely has channeled his energy in

12

volunteering at animal-based charities. For example, he has been using his construction skills to assist in the building and maintaining of animal shelters.

Mr. Lang's actions since his release from jail comport with the government's own philosophy. In the government's response to Kevin Johnson's sentencing memorandum, the government explained, "If a defendant has never received a sentence of incarceration in the past, there is much hope that a light sentence will deter him from committing further conduct." (Dkt #147 at 4) While it may not be true of every defendant, it is true of Mr. Lang. The jail sentence he received in his state court case has deterred him from continuing this type of conduct.

### 2. General Deterrence

While many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the most pertinent question for this Court is whether a term of further imprisonment is minimally necessary to serve this purpose of sentencing.

There is no evidence that the *severity* of punishment has an effect on general deterrence. The deterrence literature has been reviewed several times by groups of scientific experts at the request of sentencing policymakers. "[I]n virtually every deterrence study to date, the perceived *certainty* of punishment was more important than the perceived severity." Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010) (emphasis added).[7]

---

[7] *See also* Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011) ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence

The National Institute of Justice of the U.S. Department of Justice and the John D. and Catherine T. MacArthur Foundation recently requested the National Research Council conduct a study to summarize what is known about the massive increase in incarceration rates in the United States over the last four decades. The resulting extensive report, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, devotes an entire chapter to the subjects of deterrence and incapacitation. *See* National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences*, Committee on Causes and Consequences of High Rates of Incarceration, J. Travis, B. Western, and S. Redburn, Editors (2014) (see generally Chapter 5: The Crime Prevention Effects of Incarceration). Among many other findings, the report concludes, "that research indicates that the large increase in incarceration rates has not clearly yielded sizable reductions in crime." *Id.* at 342. The report continues that "the decision to commit a crime is more likely influenced by the certainty and swiftness of punishment than by the severity of the criminal sanction." *Id.* at 345.

Even assuming that an incarceration sentence has a greater deterrent effect than a non-incarceration sentence, the fact remains that Mr. Lang has already been incarcerated. As part of the state case, he was sentenced to serve 170 days in the Woodford County Jail. With good time credit, he served just under 3 months in jail. Such a sentence sends a message to the community that, even if this is your first felony offense, the punishment will be significant. Anyone who engages in this behavior can expect to be incarcerated. In addition to that, they will be placed under the watchful eye of the U.S. Probation Department for an extended period of time. The community is on notice.

---

indicates that variation in the certainty of punishment has a large deterrent effect."), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf.

### E. Proposed Conditions of Supervised Release

In the PSR, the Probation Office recommends conditions of supervised release that could fairly be described as standard conditions. Mr. Lang has no objection to the proposed conditions with the exception of the one outlined below. Other than this condition, the proposed conditions seem to be supported by the facts and circumstances of this case, and do not appear to be more burdensome than is necessary.

Mr. Lang objects to the portion of discretionary condition #16 that allows his supervising probation officer to visit him at any "other reasonable location specified by the probation officer." Mr. Lang objects to this vague and arbitrary wording. *See United States v. Kappes*, 782 F.3d 828, 848 (7th Cir. 2015) (discussing the need for crucial terms of supervised release to be defined in objective rather than subjective terms).

CONCLUSION

Mr. Lang understands the seriousness of the crime he committed. He asks the Court to consider the Supreme Court's logic in *Gall*, where the Court reasoned that respect for the law is promoted when harsh punishment is tempered by consideration of an offender's character and personal history, in addition to the specific characteristics of the case at hand. *See* 552 U.S. at 54. Because this crime was out of character for him, because he has the ability and experience to ensure he remains a productive member of society, and because he has shown no sign of returning to such behavior since his release from the Woodford County jail in 2013, a sentence that does not include incarceration is appropriate in this case.

**Wherefore** based on the sentencing factors and arguments set forth above, Mr. Lang respectfully requests that this Court impose a sentence of **three years of probation** as a sanction that is sufficient, but not greater than necessary, to satisfy the statutory sentencing objectives in his case.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook,
Executive Director

By: *s/ Geoffrey M. Meyer*
Geoffrey M. Meyer
Attorney for Defendant

Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8326

16

**CERTIFICATE OF SERVICE**

The undersigned, <u>Geoffrey M. Meyer</u>, an attorney with the Federal Defender Program hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**Defendant Tyler Lang's Sentencing Memorandum**

was served pursuant to the district court's ECF system as to ECF filers, if any, and was sent by first-class mail/hand delivery on <u>March 7, 2016</u>, to counsel/parties that are non-ECF filers.

FEDERAL DEFENDER PROGRAM
Carol A. Brook,
Executive Director

By: <u>*s/ Geoffrey M. Meyer*</u>
Geoffrey M. Meyer
Attorney for Defendant

Geoffrey M. Meyer
Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8326