IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America** ) | |
| ) | **No. 14 CR 390-2** |
| v. ) | |
| ) | **Judge Amy J. St. Eve** |
| **Tyler Lang** ) | |
| ) | |

DEFENDANT TYLER LANG'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

The government asks this Court to sentence Tyler Lang to the top of the advisory guideline range. In large part the government relies on a flawed analysis of Mr. Lang's history and characteristics in order to justify this request. The government submits statements, photographs, and other documents in an attempt to establish that Mr. Lang "has been involved in illegal activism for years." (Gov't Memo at 7) However the so-called support that the government provides the Court is faulty. It falls into three categories 1) information that is unrelated to Tyler Lang, 2) information that is unreliable and should be disregarded by the Court, and 3) information that contradicts the government's position. The reality is that until August 2013, Mr. Lang had a long history of legal activism, and his lapse was singular. Since his release from jail in November 2013, he has followed the terms of his probation and federal bond.

Specifically, the government provides the Court with a statement by the University of California, Los Angeles, and statements by three current or former professors of the university.[1] The statement of Professor A is accompanied by a handful of photos. The statement of UCLA

---

[1] It is unclear why the government has anonymized the identity of the UCLA professors. The professors earlier attempted to insert themselves into this case as amici for the government. Their identities were made public at that time and remained on the docket until Judge Shadur denied their petition to join this case and ordered the documents stricken from the record at the request of the defendants because the documents were inflammatory and irrelevant.

relies predominantly on the current or former statements of the three professors, and will be discussed in that context.

The main problem with the statements the government presents to the Court is one that Mr. Lang cautioned against in his sentencing memorandum: mistakenly defining the term "animal activism" by the extreme actions of groups like the Animal Liberation Front. As stated in Mr. Lang's sentencing memorandum, he is not and never has been a member of the ALF. UCLA and the professors appear to impute his membership in the ALF on the basis of his participation in lawful protest against them. This is unfair and unfounded.

As Professor A recounts, the ALF claimed responsibility for flooding her home. (Gov't Exh. B at 1) She offers no evidence that Mr. Lang was involved. Similarly, she contends that the ALF firebombed her home (*id.* at 2) and called in a bomb threat to her husband's office building (Gov't Exh. A at 2). These actions are extremely serious, however she offers no evidence that Mr. Lang was involved in them in any way. He was not. Nor was Mr. Lang ever subject to any restraining order that UCLA and Professor A received enjoining Kevin Johnson and the ALF from "various aspects of their activities." (Gov't Exh. B at 2)

Mr. Lang acknowledges that he took part in a campaign of lawful protest against Professor A because of her use of animals in medical research. The campaign involved picketing, chanting, signs, and on occasion the use of large satirical puppets. The pickets are designed to be lawful and are observed by law enforcement. Indeed for years before 2010, law enforcement agreed that the pickets were lawful. In May 2010, without warning, that changed and Mr. Lang along with others were arrested by the UCLA police force.

2

Without getting lost in the weeds, a description of the events that led to the arrests on May 15, 2010 follows. The city of Los Angeles has an ordinance that prohibits "targeted protests."[2] In the years prior to 2010, law enforcement and the activists shared an understanding that if the activists continually marched back and forth on the sidewalk then such a protest was not "focused" as the term is used in the statute and thus could occur within 100 feet of the residence. On May 15, 2010, law enforcement abandoned that interpretation of the law and instead determined that even a continuous march protest was focused under the ordinance. They summarily arrested Mr. Lang and a number of other protesters.

The charges against Mr. Lang were later dismissed. (PSR ¶41) He did not plead guilty as UCLA and Professor A contend in their statements. He and the other activists maintain to this day that they were not knowingly violating the law as it was originally explained to them by law enforcement. However, to avoid future problems they moved subsequent protests outside the 100-foot zone. The importance of this event in the present case is this: it shows that the protests in which Mr. Lang participated were designed to be peaceful and lawful, and even when law enforcement changed the interpretation of the law, the protesters responded not with violence or obstruction, but by altering their behavior to comport with the new interpretation. Mr. Lang's lack of criminal history is consistent with this.

The Court should also consider Professor A's comments regarding Mr. Lang's behavior at the protests—specifically the February 15, 2015 protest—with great skepticism. Professor A has a history of embellishing her recitation of what occurred during protests in order to further her

---

[2] *See* Los Angeles Municipal Code 56.45(e) which states "Prohibition Against Targeted Demonstrations Focused Upon and At or About a Private Residence – Any person, acting alone or in concert with others, who pickets, parades or patrols in a manner that is both (1) focused upon the private residence or dwelling of any individual residing within the City of Los Angeles, and (2) takes place within one hundred (100) feet of such a private residence shall be guilty of a misdemeanor. Except as specified herein, nothing in this subsection shall prohibit generally the peaceful picketing or distributing pamphlets, going door-to-door, alone or in groups, in residential neighborhoods."

own agenda. For example, in April 2014 Professor A filed a petition for a temporary restraining order against an animal rights activist in Los Angeles County Superior Court. As part of her petition, Professor A submitted a declaration sworn under penalty of perjury. (*See* Exhibit 1 at LANG_014 - 019)[3] In the declaration, Professor A recounts an incident where animal activists (not including Mr. Lang) "ambush[ed]" her and her husband outside their home as they returned from walking their dogs. (*Id.*at LANG_017 ¶12) She then describes how the activists taunted her, prevented her from passing, and "moved toward [her] in a threatening, intimidating, and aggressive manner." (*Id.* at ¶13)

In response, the activist obtained through a FOIA request the video footage of the incident recorded by Professor A's university-provided security. The university has instructed security guards at Professor A's residence to document all protests through video recording. The university's video depicted the events in a manner completely different than the story presented by Professor A. When the video was ultimately presented to the superior court judge, he ordered Professor A to pay attorney's fees to the activist in part because "[Professor A] was not completely candid when she described the April 1 incident in her TRO papers. The facts she described in Paragraphs 12, 13 and 14 in her declaration filed in support of the TRO application are not consistent with the video of the incident." (Exh. 2 at 6)[4]

Mr. Lang acknowledges that while on bond in this case he took part in protests of Professor A's work organized by Progress for Science. Two things that should be self-evident bear saying explicitly. First, Progress for Science is not the ALF or any other sort of extremist group. (*See*

---

[3] Because this and other exhibits contain extensive information that would identify Professor A and the government has chosen to keep her identity anonymous, the exhibits will be provided to the Court and the government under separate cover. Mr. Lang is prepared to publicly file the exhibits upon direction from this Court.

[4] The Federal Defender Program has also obtained a copy of the video at issue in the Los Angeles case. Should the Court wish to compare the video to Professor A's declaration, a copy will be made available.

http://www.progressforscience.com) Second, lawful protest is not a violation of the terms of Mr. Lang's bond. That right was specifically reserved to Mr. Lang when Judge Shadur ordered his release. The government appears to implicitly acknowledge this (*see* Gov't Memo at 8 n.2), but then asks the Court to use it as a basis for a higher sentence.

To the extent that Professor A contends that the protests in which Mr. Lang took place were not lawful, she is wrong. The pictures provided by Professor A and submitted by the government in Exhibit C of the government's sentencing memorandum support Mr. Lang's position while contradicting Professor A's position. The pictures were not taken by Professor A or her security detail. They were obtained from Progress for Science. They cannot be used to judge the distance of the protestors from Professor A's residence, because none of the photos depict Professor A's residence. However, Picture #2 shows a uniformed police officer observing the protest—specifically he is watching Mr. Lang walk along the sidewalk with another protestor. Mr. Lang is known to be on probation and bond by law enforcement. If he violated the law at any point during that protest, then he certainly would have been arrested. Similarly, if Mr. Lang "endlessly" violated the law while on bond in this case (Gov't Exh. B at 2), Professor A's round-the-clock security (*id.* at 3) would have captured the instances with video or photos. In any event, Mr. Lang stopped participating in protests approximately one year ago because he was concerned that UCLA and the professors would twist his participation into something it was not.

The statements of the other two professors suffer from many of the same problems as the statement of Professor A. The vast majority of the statements discuss the actions of generic "groups of animal rights activists." For example, Professor B recounts how his automobile was firebombed. (Gov't Exh. A at 3; Exh. B at 5) A group called the Animal Liberation Brigade later took responsibility for the bombing. (Gov't Exh. B at 5) Mr. Lang is not and never has been a

5

part of the ALB. Where there is any specificity in the professors' statements, it relates to the actions of Kevin Johnson, not Mr. Lang. (*See, e.g.,* Gov't Exh. A at 4; Gov't Exh. B at 3-4).

Mr. Lang does not deny that he previously participated in an organized campaign to protest Professor B's work by picketing outside his residence. Mr. Lang also does not deny that he has, in the past, acted as a chant leader at those protests. Mr. Lang does deny that the pickets were illegal. As with Professor A, the pickets outside Professor B's residence were designed to be lawful and were observed by law enforcement. Professor B's own statement to the government acknowledges that the details of upcoming pickets are posted in advance on social media. (Gov't Sent. Memo at 8) Law enforcement knows of these pickets in advance and monitors them closely. If Mr. Lang had violated the law at any point, his criminal history, or at the very least his arrest record, would reflect that. It does not.

Finally, the government submits to the Court two copies of permanent injunctions that large corporations received barring Mr. Lang and others from protesting at their offices or the homes of their employees. Mr. Lang acknowledges that he participated in protest campaigns at both the business offices and homes of certain employees of the companies. Far from demonstrating that Mr. Lang was involved in illegal activity (as the government seems to imply), the injunctions show the standard response of large corporations when they are subject to protest campaigns that do not involve illegal behavior. Unable to involve the police because the protests were legal, the companies turned to injunctive relief. Mr. Lang did not fight the entry of the injunctions because at the time he was not financially able to do so. To the extent that the injunctions have any relevance to these proceedings it is that, when the injunctions entered, Mr. Lang ceased protesting the companies and their employees. In other words, he altered his behavior in order to follow the court's order.

6

It has been clear throughout this case that passions on both sides of this issue are extremely high. The Court should reject the government's attempt to obfuscate the real issue here when it submits statements about wholly unrelated events. The attempt by the university and the professors to associate Mr. Lang with these actions amounts to rank speculation at best, and at worst a manipulative attempt to silence lawful protest through intimidation. Furthermore, the university and the professors' attempts to characterize Mr. Lang's history of lawful protest as illegal are illogical, unfounded, and not supported by the very evidence they submit. This Court should reject these statements in their entirety. Instead, for the concrete reasons presented in Mr. Lang's sentencing memorandum, the Court should impose the requested sentence of probation for a term of three years as a sanction that is sufficient, but not greater than necessary, to satisfy the statutory sentencing objectives in this case.

          Respectfully submitted,

          FEDERAL DEFENDER PROGRAM
          Carol A. Brook,
          Executive Director

By: *s/ Geoffrey M. Meyer*
       Geoffrey M. Meyer
       Attorney for Defendant

Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8326

### CERTIFICATE OF SERVICE

The undersigned, Geoffrey M. Meyer, an attorney with the Federal Defender Program hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**Defendant Tyler Lang's Response to Government's Sentencing Memorandum**

was served pursuant to the district court's ECF system as to ECF filers, if any, and was sent by first-class mail/hand delivery on March 14, 2016, to counsel/parties that are non-ECF filers.

        FEDERAL DEFENDER PROGRAM
        Carol A. Brook,
        Executive Director

        By: *s/ Geoffrey M. Meyer*
        Geoffrey M. Meyer
        Attorney for Defendant

Geoffrey M. Meyer
Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8326